IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

NATHANIEL REDDING,

     Plaintiff,

v.                                      CASE NO. 4:13-cv-408-RH-GRJ

CATHY SIMCOX, et al,

     Defendants.

_____/

## <u>REPORT AND RECOMMENDATION</u>

Pending before the Court is Defendants' Motion for Summary Judgment, Doc. 44. Plaintiff has filed a response in opposition, Doc. 47, and the motion is now ripe for review. For the reasons discussed below, the undersigned recommends that Defendants' motion be granted.

### I. Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F. 2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is

successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.   *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785-86 (11th Cir. 2005).

In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgement stage." *Beard v. Banks, 548 U.S. 521, 530 (2006)*.  Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.  *See, e.g., Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001.)

## II.  Plaintiff's Allegations

Plaintiff alleges that despite not having asthma, ARNP Patricia Kalu[1] gave him medication for asthma that caused him pain.  He also alleges that Ms. Kalu refused to draw his blood or give him medication or treatment for his weight loss.  Plaintiff represents that he wrote to the medical director, Defendant Cathy Simcox, explaining

---

[1] Patricia Kalu was named as a Defendant but was dismissed by the Court for Plaintiff's failure to timely serve her pursuant to Fed. R. Civ. P. 4(m).  See Doc. 31.

the problem, but she refused to acknowledge his complaints.

Plaintiff claims that Defendant Ana Bucarelli, M.D., the Chief Health Officer, refused to examine him.  He was referred to Defendant ARNP E. Heuler, who examined him but refused to acknowledge the knot in his throat and his weight loss. Plaintiff claims that Nurse Heuler only ordered water pills and changed the dosage on his blood pressure pills.

Plaintiff represents that due to the lumps in his throat, he believes he had cancer and asked to be sent to a nose and throat specialist.  He claims he was not treated for his alleged cancer.  Plaintiff believes that Nurse Heuler and Dr. Bucarelli were negligent by failing to order x-rays for his neck.  He claims that the delay in treatment by the medical staff at Taylor C.I. has caused him a great deal of pain and suffering.  Plaintiff further alleges that Dr. Bucarelli has a duty to correct wrongs by the nurse practitioners. Plaintiff claims that these events demonstrate that the Defendants were deliberately indifferent to his medical needs.

### III.  Defendants' Summary Judgment Evidence

Plaintiff was incarcerated at Taylor Correctional Institution from November 9, 2012 to August 14, 2013. (Doc. 44-3 at 1-23.)  Upon his arrival, he was 6' 3" tall and weighed 158 pounds, which is within the normal limits of the Body Mass Index (BMI) for his size and height. (Doc. 44-2 at 2, Doc. 44-3 at 3.)  Based on Plaintiff's BMI, ARNP Kalu cancelled his 4,000 calorie diet pass. (Doc. 44-3 at 3.)

Plaintiff underwent a pre-special housing evaluation on February 5, 2013. (Doc. 44-3 at 4.)  He weighed 163 pounds.  *Id.*  On February 7, 2013, Plaintiff refused several

medications and signed a refusal form. (Doc. 44-3 at 6.)  Plaintiff went to medical on February 18, 2013 with complaints of a runny nose, coughing-up mucus, and weight loss.  (Doc. 44-3 at 7-8.)  Plainitff weighed 145 pounds.  *Id.*  Medical staff noted diminished breathing sounds and renewed Plaintiff's inhaler, but found no swelling in the neck.  *Id.*

On February 19, 2013, Plaintiff reported to medical for a follow-up. (Doc. 44-3 at 9.)  Nurse Kalu noted that Plaintiff had a history of asthma, his lungs sounded diminished, and his mucous membranes were inflamed. *Id.*  She found that Plainitff had an upper respiratory infection and renewed his inhaler and medications.  *Id.*  Plaintiff received a 4,000 calorie diet pass effective until May 20, 2013.  *Id.*

Plaintiff went to medical on April 15, 2013 complaining of a running nose and itching throat. (Doc. 44-3 at 10-11.)  His weight was recorded as 153 pounds.  *Id*.  He was given an inhaler, CTM (chlorpheniramine maleate), and nasal spray saline.  *Id.*  On May 6, 2013, Plaintiff went to medical to address his athlete's foot, blurred vision, and hemorrhoids, and to get his diet pass renewed. (Doc. 44-3 at 12.)  Plaintiff was given antifungal cream for his feet and Dibacaine for his hemorrhoids. *Id.*  Plaintiff's diet pass was renewed and he was told that he did not qualify for glasses. *Id.*

Plaintiff went to medical on May 9, 2013 to request sinus pills and analgesic balm and express concern over his weight loss. (Doc. 44-3 at 13.)  His weight was 151 pounds. *Id.*  The nurse noted that muscle rub was not indicated and that Plaintiff had no signs or symptoms of nasal drainage, congestion, or dehydration that would warrant prescription of sinus medications. *Id.*  She referred Plaintiff for evaluation regarding his

weight loss. *Id.*

Plaintiff saw Defendant Nurse Heuler on May 16, 2013, for evaluation of his weight loss and sore throat. (Doc. 44-3 at 14.) Plaintiff denied having asthma. *Id.* Plaintiff weighed 149 pounds at the examination, and he told Nurse Heuler that he had lost 63 pounds in 2 years. *Id.*; (Doc. 44-2 at 5.) Defendant Heuler noted that Plaintiff expressed concern about his thyroid and found his thyroid was enlarged. *Id.* She noted no asymmetry of his face, no nodules, and normal lymph nodes. *Id.* She reported that Plaintiff had high blood glucose and that his blood count showed iron deficiency anemia. *Id.* Nurse Heuler diagnosed Plaintiff with pharyngitis and a sore throat and ordered a 10 day supply of Amoxil. (Doc. 44-3 at 14.) She ordered a thyroid function test to check for overactive thyroid and an AIC percentage test to measure his glucose. (Doc. 44-1 at 3; Doc. 44-2 at 5.) She ordered Lisniopril in place of Norvasc to improve his blood pressure and protect his kidney function. (Doc. 44-1 at 3.)

Plaintiff received a chest x-ray on May 23, 2013 for his asthmatic symptoms. (Doc. 44-2 at 6.) He went to medical on June 3, 2013 and stated that he saw Nurse Heuler for neck pain but that she "didn't get [him] anything for it." (Doc. 44-3 at 15.) He was given Ibuprofen for his neck pain. *Id.* Plainitff's weight was recorded as 150 pounds. *Id.* Plaintiff was instructed to watch the inmate call out list for his appointment time for a blood withdrawal. *Id.*

Defendant Bucarelli reviewed Plaintiff's chart on June 14, 2013 and directed the nurse to schedule a chronic care clinic. (Doc. 44-2 at 6; Doc. 44-3 at 16, 53.) On August 1, 2013, Plaintiff attended sick call complaining of a first degree burn to his right thumb,

weight loss, stomach pain, headache, dizziness, special diet, and sunglasses. (Doc. 44-3 at 18.)  He weighed 134 pounds and his 4,000 calorie diet pass was extended to November 2013. *Id.*  Staff dressed his burn and informed him how to care for it.  *Id.*  He saw a nurse on August 2nd  and 5th for monitoring of the burn. *Id.* at 20.  Plaintiff went to medical on August 12, 2013 for bleeding from the rectum. (Doc. 44-3 at 21.)   He was provided rectal cream, and his weight was 146 pounds.  *Id.*

Plaintiff was transferred from Taylor Correctional Institution to NWFRC on August 14, 2013. (Doc. 44-2 at 6-7, Doc. 44-3 at 23-24.)  At NWFRC, Plaintiff went to sick call seeking a thyroid specialist. (Doc. 44-3 at 31.)  On August 27, 2013, staff drew blood for a thyroid test.  *Id.*  at 19.  A thyroid panel was drawn on September 19, 2013, including an x-ray of the neck.  *Id.* at 33-35.  On September 26, 2013, Plaintiff was diagnosed with hyperthyroidism due to Graves' Disease.  *Id.* at 40, 54, 63.  He was not responding to treatment and had a severe goiter, so his thyroid was surgically removed in August 2014.  *Id.* at 65-76.

### IV. Plaintiff's Summary Judgment Evidence

In his response, Plaintiff submits eight documents from Defendants' motion that he calls "unanswered documents." (Doc. 47 at 21-28.)  The documents are various health records dated August 14, 2013, August 16, 2013, September 9, 2013, September 27, 2013, October 14, 2013, and November 25, 2013.  *Id.*  Plaintiff argues that Doc. 44-3 at 16-17 is falsified because it has stamps from Gulf CI Annex and Columbia CI. (Doc. 47 at 29-30.)

Plaintiff presents a consultant's report from NWFRC's Dr. Roura that diagnosed

him with Graves' disease from a thyroid scan. (Doc. 47 at 32-33.)  The staff at NWFRC

made the decision to excise his thyroid. (Doc. 47 at 33-36.)

Plaintiff also submits medical reports to show his weight progression. Plaintiff's

weight progression was as follows: (1) 150 pounds on August 19, 2013; (2) 144 pounds

on August 22, 2013; (3) 135 pounds on September 9, 2013; (4) 134.5 pounds on

September 18, 2013; (5) 134 pounds on September 26, 2013; (6) 134 pounds on

October 4, 2013; (7) 144 pounds on October 29, 2013; (8) 142 pounds on November 8,

2013; (9) 152.5 pounds on December 2, 2013. (Doc. 47 at 39-49.)

Plaintiff submits a radiology report of an x-ray performed on his chest on May 23,

2013. (Doc. 47 at 51.)  The report states that "the soft tissues and bony thorax are

unremarkable.  The cardiac, hilar, and mediastinal contours are normal.  The lung fields

are clear without infiltrate, mass, effusion, or pneumothorax.  The dependent pleural

spaces are normal.  The diaphragms are not depressed." *Id.*  The x-ray was performed

by Dr. Charles Bianco and Dr. Bucarelli referred Plaintiff for the exam.  Plaintiff had

another chest x-ray on September 9, 2013 while at NWFRC. (Doc. 47 at 52.)  The

examiner found clear lungs, that the cardiomediastinal silhouette was within normal

limits, and that the osseous structures are unremarkable. *Id.*  The examiner found

possible bullet fragments in the lower left neck and left first rib region and that the lung

fields were mildly hyperinflated.  *Id.*

Plaintiff also submits 19 grievances about various medical problems during his

time at Taylor C.I.  (Doc. 47 at 54-72.)  Finally, he submits three different laboratory

tests from NWFRC to show his body's "low points." (Doc. 47 at 73-79.)

## V.  Discussion

With regard to deliberate indifference claims under the Eighth Amendment, the Supreme Court held in *Estelle v. Gamble*, 429 U.S. 97 (1976) that "to prevail on a deliberate indifference to serious medical need claim, [a plaintiff] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  To establish the second element, deliberate indifference to the serious medical need, the plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir.2004); *see also Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994) (explaining that the plaintiff must show that the defendant was "both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference").

Generally, an inmate who receives a medical diagnosis and care, but desires a different diagnosis or treatment, cannot show deliberate indifference.  *Hamm v. DeKalb County*, 774 f.2d 1567, 1575 (11th Cir. 1985); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir.1991)*; see also Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[A]s *Estelle* teaches, the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment is a 'classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment.") (quoting *Estelle* 429 U.S. at 107)); *Waldrop v. Evans*,

871 F.2d 1030, 1033 (11th Cir. 1989) ("'[W]e disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment.  Along with all other aspects of health care, this remains a question of sound professional judgment.'") (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").  For the same reason, the fact that jail medical personnel did not refer a plaintiff to an outside physician does not provide a basis for Eighth Amendment liability.  *See Estelle* 429 U.S. at 107 ("A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment.").

"Delay in access to medical attention can violate the Eighth Amendment ... when it is tantamount to unnecessary and wanton infliction of pain." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir.1994) (citation and internal quotation marks omitted), abrogated on other grounds by *Hope v. Pelzer*, 536 U.S. 730 (2002). Deliberate indifference in the form of an unreasonable delay is cognizable when prison officials delay treatment for life-threatening emergencies, but also in "situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Id.* Ultimately, however, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Id.*

### A. Nurse Heuler

 Plaintiff claims that Nurse Heuler examined him but refused to acknowledge the

knot in his throat and his weight loss, and only ordered water pills and changed the dosage on his blood pressure pills. Plaintiff contends that Nurse Heuler was negligent in failing to order x-rays for his neck.

Defendants' summary judgment evidence shows that Nurse Heuler examined Plaintiff one time, on May 16, 2013, for his concerns about weight loss and a sore throat. (Doc. 44-2 at 4, Doc. 44-3 at 14.)  Nurse Heuler found that Plaintiff weighed 149 pounds.  (Doc. 44-2 at 5, Doc. 44-3 at 14.)  Nurse Heuler examined Plaintiff's throat and found no asymmetry of the right and left side of his face, no nodules, normal lymph nodes, and an enlarged thyroid.  *Id.*  She diagnosed Plaintiff with pharyngitis and a sore throat and prescribed Amoxil.  (Doc, 44-2 at 3, Doc. 44-3 at 14.)  Nurse Heuler ordered a thyroid function test to check for overactive thyroid and an AIC percentage test to measure Plaintiff's glucose over a three month period, and changed his blood pressure medication. *Id.* That was the extent of Nurse Heuler's involvement with the Plaintiff.

The only suggestion that Plaintiff was either denied treatment or delayed treatment is that the thyroid test and the AIC test, Nurse Heuler ordered, were never completed. The failure to compete the thyroid test, however, does not demonstrate deliberate indifference by Nurse Heuler because as an ARNP, she is not responsible for scheduling tests and arranging follow-up appointments at the prison. (Doc. 44-1, ¶1.)  Nurse Heuler avers that she followed the procedures for scheduling and performing tests for inmates after she examined Plaintiff and ordered the tests. *Id.* Pursuant to this procedure, after Nurse Heuler ordered the tests for Plaintiff, Nurse Heuler spoke with Ms. Campbell, the scheduler, to schedule the thyroid test, as well as

the other tests she ordered. *Id.* After contacting the scheduler, Nurse Heuler, would have delivered Plaintiff's medical chart to the file room in the nurse's station. After that the scheduler—and not Nurse Heuler—arranges for the technician to draw blood and arranges for the tests to be performed. *Id.*  Staff, other than Nurse Heuler, are responsible for entering the time and date for the appointment in the computer. The computer then generates a call out list which is posted on the inmate dorm bulletin board each day for the inmates to track their medical appointments. *Id.* Once the test has been performed and the results are received from the lab, other staff note the results in the inmate's medical chart and then arrange for a follow-up visit with the ARNP. *Id.*  Notably, Nurse Heuler does not learn of the results of the test—or as in this case that the test was not performed—unless the procedures are followed and a follow-up appointment is scheduled.

In sum, Nurse Heuler would not have had any knowledge that the tests were not performed until or unless a follow-up appointment was made. Nurse Heuler examined and diagnosed Plaintiff, ordered testing and followed the procedures for initiating the procedures for the tests to be performed. These facts are uncontroverted in the record. Thus, there is no evidence that Nurse Heuler failed to treat Plaintiff or delayed Plaintiff's treatment. Rather, the record demonstrates—without any contrary evidence—that Nurse Heuler ordered testing, initiated the process for the testing to be performed and was never alerted to the fact that the tests were not performed and then failed to take further action.  While it may have been someone else's responsibility to ensure that the tests were scheduled and completed—and possibly someone else's fault that the tests

were never completed----there is simply no evidence in the record demonstrating that Nurse Heuler failed (either deliberately or even negligently) to schedule the test and there is no evidence in the record demonstrating that Nurse Heuler knew the tests had not been performed or that she recklessly failed to ensure that the tests were performed.

Accordingly, Plaintiff has failed to demonstrate on this record that Nurse Heubler was deliberately indifferent to his medical needs. *See, McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992)(*overruled* on other grounds, *WMX Technologies v. Miller*, 104 F. 3d 1133 (9th Cir. 1997 *(en banc)*)(summary judgment in favor of doctors affirmed in claim by inmate for deliberate indifference for delaying testing because there was no evidence that doctors were responsible for the scheduling of the diagnostic treatment).

In addition to Plaintiff's failure to show that Nurse Heuler was responsible for the failure to perform the thyroid tests, Plaintiff has not produced any evidence showing that the delay in performing the thyroid test was detrimental to his treatment. The Eleventh Circuit requires an inmate who alleges an Eighth Amendment deliberate indifference claim based upon a delay in treatment to "place verifying medical evidence in the record to establish the detrimental effect of delay in the medical treatment to succeed." *Hill v. Dekalb Reg'l Youth Det. Ctr.*,  40 F.3d 1176, 1187-88 (11th Cir. 1994).  According to Ana Bucarelli, M.D., there is no medical evidence suggesting that had the thyroid test been performed when Nurse Heuler ordered it Plaintiff would have avoided the removal of his thyroid. (Doc. 45-1, ¶24.)  The evidence of record demonstrates that at worst there was a four month delay in conducting the thyroid test. In August 2013 (four months after

being examined by Nurse Heuler) and after Plaintiff was transferred to NWFRC, a thyroid panel test was performed. Plaintiff was never diagnosed with cancer but was diagnosed with Grave's disease and hyperthyroidism, two conditions that are difficult to diagnose. *Id.* Notably, the surgical excision of Plaintiff's thyroid, in August 2014—one year after he was diagnosed with Grave's disease and hyperthyroidism—was not performed because Plaintiff had cancer. And there is no evidence that the surgical excision of Plaintiff's thyroid was caused by the four month delay in performing the thyroid tests ordered by Nurse Heuler in May 2013.

Accordingly, because there is no genuine issue of material fact as to whether Nurse Heuler was responsible for scheduling errors in conducting the thyroid test—and Plaintiff has not controverted Defendant's evidence that the four month delay in performing the thyroid exam was not detrimental to Plaintiff's medical condition or that the delay did not cause the excision of his thyroid more than one year later— Plaintiff has failed to demonstrate that Nurse Heuler violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs. Defendant Nurse Heuler, therefore, is entitled to summary judgment in her favor.

### B. Dr. Bucarelli

Plaintiff claims that Defendant Ana Bucarelli, M.D., the Chief Health Officer at Taylor Correctional Institution, refused to examine him. Plaintiff says that even though he complained he had cancer he was not sent to a specialist. He further says that Dr. Bucarelli was negligent by failing to order x-rays for his neck, and that Dr. Bucarelli has a duty to correct wrongs performed by the ARNPs.

As a preliminary matter, Plaintiff has no constitutional right to be examined by a doctor instead of a nurse. *Roney v. Clark*, No. 4:07-cv-80-SPM/WCS, 2007 WL 2096335 at *2-3 (N.D. Fla. July 17, 2007)("Absent a compelling medical necessity [...], there is no constitutional right to have an examination by a doctor rather than a nurse."). Dr. Bucarelli is not required to examine Plaintiff instead of an ARNP unless a compelling medical necessity dictates otherwise.  In this case, no compelling medical necessity existed—Nurse Heuler, the ARNP, examined Plaintiff instead of Dr. Bucarelli, and ordered a thyroid examination for Plaintiff, which Defendant Heuler attests was proper and appropriate. (Doc. 44-2 at 5.)  Accordingly, Plaintiff has not shown there was a compelling medical necessity for an examination by a doctor rather than a nurse practitioner.

Plaintiff says he thought he had cancer because he had lumps in his throat and Dr. Bucarelli refused to refer him to a specialist.  Plaintiff claims that Dr. Bucarelli was negligent by failing to order x-rays on his neck.  The question of whether additional diagnostic techniques or forms of treatment are indicated is a matter for medical judgment and not a basis for grounding liability under the Eighth Amendment.  *Adams*, 61 F.3d at 1545.  Therefore, Dr. Bucarelli's decision regarding whether or not to refer Plaintiff to a specialist and whether or not to take x-rays is a matter of medical judgment and not a basis for liability.

 More notably, Plaintiff's medical records do not reflect that Plaintiff had cancer, should have been tested for cancer or ever received cancer treatment. (Doc. 45-1, ¶20.)  And, as discussed above, Plaintiff's medical records do not reflect a diagnosis of

cancer but instead that after the completion of his thyroid tests, Plaintiff was diagnosed with Graves' disease, an immune system disorder, and hyperthyroidism. (Doc. 44-3 at 54, Doc. 45-1 at 8.)  Plaintiff never raised the issue of cancer during any of his visits to medical at Taylor C.I.  (Doc. 44-3.)  Thus, Plaintiff's claim that Dr. Bucarelli should have referred him to a specialist or taken x-rays has no support in the record.

Plaintiff further contends that Dr. Bucarelli is liable for the deliberate indifference by her staff based upon her position as Chief Health Officer of Taylor Correctional Institution. There are two problems with this claim. First, as a general proposition, supervisory liability only attaches if the supervisor "personally participates" in the allegedly unconstitutional conduct or if a "causal connection" exists between their actions and the alleged constitutional deprivation.  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  As Plaintiff concedes, Dr. Bucarelli never treated Plaintiff while he was incarcerated at Taylor Correctional Institution.

Second, while Dr. Bucarelli did review Plaintiff's medical file she only did so for the purpose of scheduling a chronic care clinic. (Doc. 45-1 at 6.)  Dr. Buccarelli did not, however, examine Plaintiff's entire medical records for the purpose of confirming that all tests ordered had been performed and the results received. *Id.* Thus, there is no evidence of record that Dr. Bucarrelli knew that the thryoid test ordered by Nurse Heuler had not been performed. In short, there is no evidence in this record of a causal connection with, or personal participation by Dr. Bucarelli, concerning Plaintiff's claim that the failure to conduct the thyroid test constitutes deliberate indifference.

Additionally, and as discussed above, even assuming Dr. Bucarrelli should have

known the thyroid test ordered by Nurse Heuler had not been performed, there is no

evidence in this record that the excision of Plaintiff's thyroid more than one year

later—or any other treatment Plaintiff received for his thyroid or did not receive for his

thyroid—was caused by or exacerbated by the failure to conduct the thyroid test in May

2013.

Accordingly, because Plaintiff has not shown that Dr. Bucarelli participated in a

constitutional violation, Dr. Bucarelli is entitled to to summary judgment in her favor with

regard to Plaintiff's claim for deliberate indifference.

### C. Defendant Simcox

Plaintiff alleges that Defendant Cathy Simcox was the medical director of Taylor

Correctional Institution and that based upon her position in responding to medical

grievances, she knew about Plaintiff's medical condition but deliberately failed to take

action.  Plaintiff says that Ms. Simcox knew that Nurse Kalu had prescribed asthma

medication despite the fact that Plaintiff did not have asthma and that Ms. Simcox

generally refused to acknowledge his health problems.

Ms. Simcox was not the medical director at Taylor C.I. but rather was the Senior

Health Services Administrator at Taylor C.I. while Plaintiff was housed there. (Doc. 44-

4.)  In this capacity Ms. Simcox held an administrative position (not a medical position)

and was responsible for responding to inmates' medical grievances by reviewing their

charts and records and discussing the issue with a medical provider. *Id.* at 1.

The record reflects that Ms. Simcox responded to six requests filed by Plaintiff:

(1) On December 14, 2012, Plaintiff requested a 4,000 calorie diet pass, and Ms.

Simcox responded that there was no reason for the 4,000 calorie diet because Nurse

Kalu found Plaintiff's body mass index to be normal.  (2) On February 25, 2013, Plaintiff

filed two requests concerning mucus with blood from his nose and weight loss. Ms.

Simcox responded that Nurse Kalu reviewed his chart and his inhaler and medications

were renewed. (3) On March 5, 2013, Plaintiff filed a request for cold medication.  Ms.

Simcox responded that Plaintiff was seen by the nurse on February 20 and that Plaintiff

should contact sick call for new problems. (4) On May 1, 2013, Plaintiff filed a request

complaining that he was misdiagnosed and that he should be on weight boosting drugs

or Ensure. Ms.  Simcox responded that this issue was dealt with in a formal grievance

and Plaintiff should contact sick call for medical problems. (5) On May 16, 2013,

Plaintiff filed a request concerning his belief that he had thyroid cancer and needed

weight enhancing drugs, antibiotics, and a high calorie diet. Ms. Simcox responded that

Nurse Heuler examined Plaintiff that day and did not prescribe new medications and

that his weight had remained consistent since the first of the year. (Doc. 44-4, Doc. 44-

5.)

   As evidenced by Plaintiff's medical records and confirmed in Ms. Simcox's

declaration, Ms. Simcox's sole involvement with Plaintiff's medical care was in her

administrative role in responding to Plaintiff's inmate requests.  Ms. Simcox is not a

medical professional, but worked only in an administrative capacity.  Where, as here,

there is no allegation that the prison official was involved in the alleged constitutional

violation and the prison official's only role involved the denial of administrative

grievances and the failure to act, the prison official is not liable under § 1983 based on

a theory that the prison official's failure to act constituted an acquiescence in the

unconstitutional conduct. *McCiskill v Thompson*, no. 3:10cv211/MCR/MD, 2010 WL

4483408, at *4 (N.D. Fla. 2010); *Demm v Charlotte County Jail Admin. & Staff,* no.

2:04-cv-634-FtM-99SPC, 2007 WL 57772, at *4-5 (M.D. Fla. Jan. 5, 2007).

     Accordingly, because Ms. Simcox is not a medical professional, and her only

involvement with Plaintiff was in responding to grievances, Ms. Simcox cannot be held

liable for the alleged unconstitutional acts of medical professionals and cannot be held

liable for failing to take medical action with regard to Plaintiff's medical treatment. Ms.

Wilcox is, therefore, entitled  to summary judgment in her favor.

## VI.  Recommendation

     Based on the foregoing, it is respectfully **RECOMMENDED** that Defendants'

Motion for Summary Judgment, Doc. 44, should be **GRANTED**.

     **IN CHAMBERS**, at Gainesville, Florida, this 26th day of February 2015.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

     **A party may file specific, written objections to the proposed findings and
recommendations within 14 days after being served with a copy of this report and
recommendation.  A party may respond to another party's objections within 14
days after being served with a copy thereof.  Failure to file specific objections
limits the scope of review of proposed factual findings and recommendations.**